This is the first case of the morning. Call 212-0460. Board of Education of DuPage High School District 488 and Board of Education of Salt Creek School District 48 v. Laura Pollastrini, et al. On behalf of the Appellant, Ms. Patricia Spratt. On behalf of Faculty of School District 88, Mr. William Gleason. And on behalf of School District number 48, Mr. Peter Wilson. All right. Is everyone ready to proceed? And good morning, by the way. Ms. Spratt. Good morning, Your Honors. My name is Patricia Spratt. I'm along with my partner, Timothy Eaton. We represent the Committee of 10. And we're here to ask you to affirm what the school board did at the hearing on the petition to detach from Districts 48 and 88 and attach to Districts 53 and 86. As the Court knows, the issue in this case is so intensely fact-bound, there's no argument that the board did not apply the right law. So as a fact-bound argument, our standard here is that the board has to have come to its decision by the manifest weight of the evidence, and if it has, then it should be affirmed. Under Carver, we have the burden of showing that the benefit to the detaching district is, or the detriment to the detaching district is outweighed by the benefit to the attaching districts. Before we get to Carver, let me ask you about the signatures on the petition. Certainly. I think it was one of the board members indicated or said something to the effect of, I don't understand why we don't trust the circulator, the circulator's signature for all of the names on the sheet. And so just compare the circulator's signature that the notary public has attested to. Is that correct, that if the circulator swears that the signatures are correct, then we should just go by what the circulator says and not even look at the signatures? I believe the statute says you have to look at the signature to see that it matches the registration, the election registration card. Of each of the individuals that signed the petition? Correct. So we're not just going to trust what the circulator of the petition attested to? And I don't think that was correct on the part of the board. Okay. I do agree that it's the statute that controls here. And what the districts argued in front of the board was that they do exactly that, that they compare the signatures on the petition to the signature on the registration card and make a determination for themselves. And it's a subjective determination that there were a sufficient number of signatures that jurisdiction is vested in the board to hear the petition. Did the board do that? Exactly. And it's in the order denying the motion to dismiss says that they did exactly that. They looked at each of the signatures and made their own determination. And your argument regarding the standard of review is? Manifest weight. Manifest weight. Correct. And what is the term within the statute, match? What does the term match mean? Well, that's not defined. Does that mean that you can determine from what's on the signature line that it's the same person because it's the same address and that person's registered? And the circulator has attested under oath that that's the person who signed? The statute doesn't define the term match, so it's a difficult definition that perhaps you'll help out with the case law. Should there be a presumption that the signature is probably the signature of the voter? Because in a democracy, just like an election code, we liberally interpret those terms. Absolutely. Absolutely. A signature, if you yourselves look at some of these signatures on the registration cards and compare them to the voter cards, there is a time differential of up to 20 years. Some of these people have lived in the territory for a long time, and they signed a voter registration card. One I saw was from 1982. And people don't carry it around in their pocket. They don't carry it around in their pocket, but the signature changes over time. A young girl might dot her I with a heart, and when she's an adult, she uses the dot over the I. Those sorts of things change with time. You bring up a good point. You asked us to take a look at the signatures. Should we take a look at the signatures? Would that not be a de novo review? It would be. Just to satisfy yourselves what the board did, what it said it did, it was looking at the signatures. Now, if somebody changes their signature, I appreciate if you dot an I or dot an I with a heart, but if you use your first initial as opposed to using your first name, isn't that a drastic difference in a signature? You know what, Your Honor, I'm sorry, but I would disagree. I think if you look at the first initial and compare the two and then look at the last name, people's use of names change. Mr. Eaton is J. Timothy Eaton. I'm a married woman, but I don't use my husband's name. Well, he's so rich he gets to have two names. Moving beyond that, some of the factors the board considered, as you acknowledge, that they considered some improper factors. For example, in a developed area, they should not be considering the future benefit for future children, should they? Your Honor, this court in my court said you must consider future children. And it's ludicrous to think that a school board wouldn't consider future children. And I say that from a position of being a baby boomer. And as I was going through grade school, schools were being built to accommodate us. And now that the elementary and high school age population is collapsing, they're being torn down. School boards have to consider future children. And in this case, the future children they could have been considering were the children who were the pre-K children of some of the petitioners who testified. And Mary Olitzewski testified herself that when her daughter got to be, if there were to be attachment to the new district, her daughter would go to the new school. The other parents said they'd like the choice. They didn't have it. They'd like the choice. But that's one subgroup of future children. But how do they have a choice if there's a detachment? That's where they're going. They'd like the option. I'm sorry. I misspoke. They'd like the option of going to 83, 53, or 86. So you're not saying that if there's a detachment, they could go either way. They'd have to go to the annexed school district. That's correct. So what we have here in the evidence that was presented before the board, we've argued, is it's conflicting evidence, but as to the carver factors, the benefit and the detriment analysis, it's equally weighted as to the curricula and the facilities and as to the finances. And when it's equally weighted, then you look to some benefit. There were two experts who talked about the benefits, the curricula and the education opportunities at the two high schools in particular. They were using allegedly the same data, and they came with vastly different opinions. How does that reconcile? I believe, Your Honor, that Dr. at the high school, though, it was Carolyn Shields who testified. I don't know that she was qualified as an expert. I don't recall having read that in the transcript, and I know that Ann Scott, who rebutted her testimony, also was not qualified as an expert. They were each giving the board the information that they got from the information they got from the schools. But they did come to conclusions, and the conclusions were different. And Carolyn Shields' conclusion was that the curriculum at Willowbrook High School was superior to that at Hinsdale Central. The curriculum there, the curriculum and the facilities, there were more courses, there were more diverse courses. But when that testimony was put to the test by Ann Scott, who looked at the same exhibits, there were district exhibits 1 and 11, she looked at those exhibits and prepared a chart, a compilation of all of the information on both of those exhibits, and the end result is Hinsdale Central High School has more and diverse courses. I think the percentage that Ms. Scott gave was... I just have a greater number of courses in more diverse subjects. And the districts respond with, well, there's more students at Hinsdale, so they'll have more courses. But that is not an accurate correlation. If there are five sections of freshman English classes in Hinsdale, and there are six sections of freshman English in Willowbrook, there's still only going to be one course reflected in the catalog, one freshman English course offered, but several sections. That's what Dr. Shield was arguing, that there were more courses because there were more students. And that's not a proper correlation. How many children actually were affected? I was reading the transcript. Fourteen in the elementary school level and three in the high school level. And as that affects the financial status of both schools, it's de minimis, especially the three students. Neither one of these schools is going to... But Willowbrook says that they're going to have to cut probably 30 teachers. Well, they're already in trouble, and if this detachment occurs, they're going to have to cut staff, which will cut classes for the rest of the children remaining. It may well be that the schools will have to cut, find places to cut. That's not particular to Willowbrook. That's endemic throughout the state of Illinois. What we have to look at is what is the effect of the loss of these children, and three children leaving a school and attaching to a new school is not going to put Willowbrook over the fiscal cliff. But it is a substantial revenue shift. It was one point, I think what Mr. Scott testified to, is it's one point something percent difference. The council has three students now, but you have encouraged us to look at the future. How do we know how many students it's going to be in the future in this area? As I said, all schools have to prepare for future children and lack of future children as populations move through the schools. The three themselves are not going to be the ones that cause the problem, the loss of those three. There are problems endemic to the school system, but that's not the discussion here today. One of the issues with respect to curriculum is that I think that the test scores are higher in the Hinsdale area, the area schools, and wasn't it testified to that most of the children or a large percentage of those children use private tutors based upon their ability to pay for private tutors? Isn't that something that we should look at in determining the difference in test scores? The testimony came from the fellow who does the private trumpet lessons, and he said he saw, as he was in private homes, he saw tutors coming in and going out. I don't know that having a tutor means that that's provided by the school to help the child, as opposed to the child is in academic trouble because the child is not getting the help, the individualized help that he needs in the classroom. I don't know that the presence or absence of tutors would make a difference here. There are students in the District 86. There's no testimony about students in District 86 having the need for tutors. There's testimony in District 48 and 88. And that could be a reflection of the kind of attention they're getting from their teachers in school. Or their parents. Or their parents. But it affects the test scores ultimately, and that's what we're really, the performance scores, because that's what the world looks at when they look at education, the performance scores. They do. The performance scores at Hinsdale are better. Their placements at college are better. Their opportunities are better. And that's the basis of this, one of the basis of this request? Well, we argue that because it's balanced or there isn't any appreciable difference in the curricula and the facilities and ultimately the finances, Congress says we look to the general welfare of the children, the benefit to the welfare of the children, and going to a school that has better test scores is a benefit to the children. If those three students can move from Willowbrook to Hinsdale Central, that's a benefit. Are these three students currently at Willowbrook or are they in private school? Do we know? They're in private school. Okay. And they would go to Hinsdale? I mean, that's the testimony. No teacher said, no parent said, yes, absolutely, I'm going to move my child. That's true. Three of them said they want that opportunity. They want their child to not have to go to parochial school and go over to the public school. The districts have argued that this is all about the value. Property values, yes. Property values. Is that a credible argument? It is not a credible argument, and I think we addressed that in our brief, but I'm certainly willing to address it again. The issue for the districts is they believe, of course, it's all about money for us. I think if you listen to their argument, it's all about money for them, and they're talking about the loss of finances to them. The need for money that came about in this case and that the Committee of Ten sought money was to support this litigation, to support the petition, and to support now going through the circuit court and the appellate court. It's not cheap, as you well know. So the signs that were placed in some homeowners' lawns were with the homeowners' consent, and the signs said we support with the dollar sign, and the intention for that was to let people know this family has contributed to our effort. Please help us. Not a subtle message that it's going to increase your property value. No person who testified on behalf of Committee of Ten said that was their motivating factor. No person. Well, motivation is important, but what about end result? If Hinsdale places students better, Hinsdale has less minorities, Hinsdale has more opportunities generally, would that not increase the property values of the homes in timber trails? There would probably be an accompanying increase in value, but what comes with an increase in value is an increase in taxes. It's a double-edged sword. If the EAV goes up, so does the taxing go up. Well, we do things for our children sometimes. We do. We do. I have a question about how this evidence came in. Now, everybody we've talked about, the trumpet instructor, the two doctors, were they under oath? They were. Were they sworn under oath? They were. And if you'll take a look at the board's ultimate order, it said it considered testimony, evidence, stipulations, and a few other things, but it certainly did not consider public comment. I was, in reading Judge Wheaton's remarks, I noticed that she suggested that the board read the Claren case, something I'm relatively familiar with. Isn't there a problem the way this hearing and many other hearings are run, this one's the one in particular, where you invite public comment, but yet you give it absolutely no shift? But how do you disregard it? You have 20 people testifying to certain things. How does the human brain disregard it? We know juries don't necessarily disregard it, although we tell them to, and, in fact, there are studies that say judges who are supposed to disregard it don't do it. So how do we expect this board to have disregarded this public comment? I think that the record here tells you how to disregard it. Well, they said they didn't. But what I'm getting at is that if you look at how many people provided public comment, the greater weight of that public comment was provided by people who supported Districts 48 and 88, the greater weight, and they all said wonderful and glowing things about 48 and 88 and their children in 48 and 88. Well, they disregarded that. That's true. But how did they disregard the other, the people who came in and said, I want my children to go here because they have better opportunities? Well, perhaps in this case we weren't in the boardroom, but the board was guided by counsel, and perhaps counsel made it clear, as he did at many of these hearings, that the comment would not be included unless it were sworn in subject to cross-examination. The vote was one vote. It was one vote. So should that play any role in our deliberation or our consideration of this case, the one-vote case? One vote is still a win, Your Honor. That's true. If there are no further questions, I'll reserve the remainder of my time. Thank you. Thank you. Now, I understand, Mr. Gleeson, Mr. Wilson, you have decided to share your time as best you're able to. Yes, Your Honor. And it looks like Mr. Gleeson is getting up first. Yes. Good morning, Your Honors, and may it please the Court. My name is William Gleeson. I represent the Board of Education of DuPage High School, District 88. At the outset, I'd like to This is Willowbrook, right? Correct. Willowbrook is the high school. It's two high schools. It's Addison Trail and Willowbrook High School. I move the standard review in the entirety question of whether or not the detachment petition should have been granted is a clearly erroneous standard rather than a manifest way standard because you're taking a legal principle and applying facts to it, and so it's a mixed question of fact and law. And while that is a heightened standard of review, it doesn't mean that you guys are a rubber stamp for what the Board did. You're supposed to look at the facts. But with respect to the petition signatures, should we look at the petition signatures with their standard of review? I believe your standard of review on that question, Your Honor, would be no because you're looking at the same documentary evidence that the Board of Review considered, and so there's no credibility determination that they made that you're not in the same position to make the same one. Was there any evidence presented that any of the signatures were invalid? And actual evidence, for example, affidavits from voters saying that they did not sign? No, Your Honor. The only evidence was the petitions themselves and the voter registration cards. It was just documents. But you certainly would have had that opportunity had you chosen to do so to go do some field investigation to determine whether or not the voters in the district actually did sign the petitions, correct? You mean we could have gone and interviewed them or something? Yes. I think we could have. We didn't do that, but we could have. This is common to an electoral challenge where you go downtown and you review the voter registration cards. That's what we did. And in some electoral challenges, you actually have affidavits from the voters saying, I did not sign. Yes, you do, and sometimes you have affidavits saying, I did sign it. It could work both ways, Your Honor. What were the problems that you found with the 95 signatures? The problems that we found, Your Honor, were that the signatures didn't match the voter registration cards. In what way? Because we don't have a definition of match. So give me one or two examples, not by name, but by observation. If I recall, the signatures didn't look the same. Some of the signatures looked as perhaps one person signed both signatures. If I recall, the signature was a long time ago, but that's what I recall. There was things where the signature didn't look genuine, it didn't look like the same signature, or it had changed. In comparing the two, we're looking at them and saying these don't match. Were there uses of, say, maybe there were somebody might have signed as Mrs., but now Mrs. was Judge, and so it was signed Judge or Doctor or something of that nature? I don't recall that specific of the differences, but I don't recall that particular example. All right. Were the changes insignificant? Were the discrepancies between the voter ID signature and the signature on the petition insignificant, in your opinion, or were they significant? No, they were significant enough to be on their face, something that we didn't think matched, and because it's a jurisdictional requirement to get to a definition, we felt that it was a significant enough issue to raise. And you did raise that issue? We raised that issue all the way up, yes, Your Honor. Are you familiar with the Piccarelli v. Lee case out of Pennsylvania? No, Your Honor. I'm not. I apologize. I'm not. How about Manning v. Regional Board of School Trustees, our case, where we said that where the board presented no evidence at the hearing and didn't challenge the signatures, we said the contention was purely negative and there was no reason to address it on review. Now, obviously, you did raise it. You did raise it. And we raised the issue. But presented no actual evidence. Well, that's not true, Your Honor. I would respectfully disagree. I believe we did present the evidence because we presented the voter registration cards. Aside from the voter registration cards and the petition, that was it. And the distinctions between the signatures were how the people signed, initial versus the full name. Correct. Those were the types of issues that were raised. And what is your definition of match, then? I think what the statute says is match. And so I would go to the dictionary and say match means it's the same. Have you read the brochure that is available on the website guiding people who would like to participate in a detachment effort? No. That's put out by the Illinois State Board of Education? No, Your Honor. Well, there's only one mention of signatures, and it says two-thirds of registered voters in any territory propose to be detached. So the guide is you have to have the signatures of the registered voters. Correct. And it's just like an election challenge. It's saying these people didn't actually sign or these signatures aren't genuine. It's the same thing as you don't have sufficient signatures because these signatures that you have aren't good. And so we're asking the board to throw them off. But the signatures are matched up with an address, correct? There's an address, correct. And also it's attested to by the circulator. A circulator saying to the best of their knowledge that the signature is true. Yes, that's true. So I just wanted to address briefly in my remaining time some of the differences in facilities and curriculum. I'd like to point out initially that the finding of the board is that the curriculum and the facilities are the same. They're comparable. So there's no educational benefit because you're receiving essentially the same educational benefit no matter whether you grant the detachment petition or not. Wasn't there a difference in opinion of the two persons who testified on that issue? I think there was a difference in opinion with respect to the courses that were applied. But I don't think that Ms. Scott ever testified to the educational benefit that was provided by the additional courses. And I think counsel went out of his way to say that she's just comparing the courses and telling you how many are here versus how many are there. And I think Dr. Shields, who has a lot of experience, education in developing and evaluating curricula, her testimony was, look, they're all offering the same core classes. They're all offering basically the same amount of classes. I think if I looked at it, there was 25 AP courses at Hensdale and 22 AP courses at Willowbrook. That's a lot of AP courses. And Willowbrook offered some courses that Hensdale didn't. And Hensdale offered some courses that Willowbrook didn't. And I think if you look at this course holding in the West Chicago case, it's a very similar analysis. The curriculum there, they're basically the same. The only other distinction that's trying to be raised is about test scores. At the outset, I'd point out that the regional board didn't make a finding that the test scores show an educational benefit. That's a creation of the petitioners. And the only evidence in the record with respect to test scores was that of Dr. Shields and that of Mr. Cross, who's the principal at Willowbrook High School. And Dr. Shields says you've got to look at a lot of different things when you're considering test scores. And one of them is the socioeconomic status of the students who are taking the test or whether they're leaving the district. Willowbrook High School has 27% more low-income students than Hensdale Central. That's a significant number. They have almost 7% more transitory students than Willowbrook High School or than Hensdale Central High School. That's a significant number. And in her opinion, she was saying, I think the numbers should be greater given the economic disparities of these kids. And that's the only evidence in the record with respect to test scores. We had some non-English-speaking kids. We had 3% higher English as a second language students as well. So, you know, we also offer more sheltered classes to help those students along because that's our student population. So there's no finding that test scores give an educational benefit. And frankly, the only evidence in the record is that the test scores don't necessarily show that there's a better education. How about the distance between the schools? Sure, Your Honor. And I think that is one of the factors under Carver. The only testimony in the evidence in the record is that the difference is essentially the same with respect to the grade schools, and it's greater with respect to the high schools. And the question that everyone's been debating is, well, how much greater? The only testimony in the record was by the individual who plans our bus routes. And she says it takes 12 to 14 minutes to drive straight from the detachment area to Willowbrook. She says it takes 27, approximately 27 minutes to drive straight from the detachment area to Hensdale Central. And they're comparing in their brief the time it takes her to run the entire bus route, making all the stops, over-doubling the miles that they travel as compared to the straight travel time. And I think that that's completely an inappropriate comparison because you're comparing apples to oranges. And so I think that the record is substantially clear that there is an increase in travel time and there's an increase in the hazards that younger drivers are going to be confronting, such as more intersections and more railroad traffic and things of that nature. Other than maybe significantly inclement weather, is there any danger when the kids are on the bus to Willowbrook that they would be on longer than 60 minutes, which I think is kind of a landmark time? No, there's no chance they'll be on more than 60 minutes. Any other questions? Thank you. Mr. Wilson? You're the grade school, correct? You're Salt Creek? Salt Creek. It's the elementary district. It takes them up through eighth grade. My name is Peter Wilson, representing the Board of Education of the Salt Creek District 48. And one of the areas that I think really needs some addressing and clarification are the financial issues. The regional board, in its findings, said that the financial evidence of the objecting school districts was flawed so that the financial loss was skewed, and that is an entirely misapplication of the evidence. In fact, the evidence was uncontroverted. There was no conflict in the evidence with respect to the annual budget for the Salt Creek District, that for the 10-11 school year, it had a moderate surplus of $109,000, and for the 11-12 school year, it had a budget loss of $209,000. Now, is Salt Creek on any of the lists, the endangered lists at this point? No. But with that, they had also, the evidence was uncontroverted, that Salt Creek had already gone through an entire process of leaning its budget, of paring down its expenses, and the testimony, again, was uncontroverted that any further cuts would have to come from programs and staff. Both Dr. Correll and Dr. Evans testified at length as to the, in addition to their core programs, where they had 24 full-time certified teachers, they have approximately 50 full-time certified staff. They testified that any further cuts were going to have to come from programs and staff. And Dr. Correll testified at length that those additional things that benefited the students of this district, both the ones from Timber Trails and the ones that were in the district otherwise, included their guidance counselor who did their mentoring program, their learning reading specialist who adjusted and helped kids in additional needs with reading, their gifted program. And it's uncontradicted that if you added a $442,000 tax loss on top of that budget, that those programs were going to have to be cut. That is going to be a serious detriment to the remaining students in that district. So what, how, did they explain how it was flawed or they just used they're flawed and they're forskewed? They just used that term. Okay. And really the only evidence coming from the petitioner's side with respect to the financial aspect was that District 48 had misstated its reserves. And they said you didn't have your approximately $2 million of reserves stated on page 1. They omit to tell you that the testimony was it was on page 4 of those same financial reports. The money was there. It was also explained, uncontradicted, that that really wasn't a full $2 million of reserves because the district sells tax anticipation warrants. It had borrowed money by selling tax warrants. That had to be repaid. That year it was $1,750,000. So that number was misstated by the petitioners. But the uncontradicted testimony of both Mr. Gallagher and Dr. Evans was that the actual reserve was $900,000 plus, give or take some dollars, that the state board's recommended reserves was 3 to 6 months, that Salt Creek's reserves were at best 1 to 2 months. Now, how many of the students, and I can't remember if it was 10 or 14 now, short memory, would be in this grade school, elementary school, actually are attending Salt Creek? My recollection is it was 14 students. They're all attending or in some private school? They were attending the public schools. The remaining students that were referenced in the testimony from the Timber Trail subdivision were in private school. And in response to the question you asked earlier, when the question was raised about the choice that the petitioners testified to, what they actually were saying was they wanted the choices whether they were going to keep their kids in private school or they might send them to the public school, but they did not commit that they were going to send them to the public school if this detachment were granted. But the bottom line is that if this detachment were granted, the overwhelming testimony of the parents of the kids actually affected those kids in school was that they did not want a change. They liked the Salt Creek District. They liked District 88 in Willowbrook. The one student who testified was very moving with respect to that to the point where her little brother in the Salt Creek District threatened to chain himself to a pole in the basement because he didn't want to leave his school and his friends. So then it's unlikely that your school district would suffer the losses that you argue here today as a result. Yes, and that's my point. They say that, but all of the uncontradicted testimony is that these things would happen, that we would be laying off up to 10 staff members, that we would be losing the gifted, we would be losing the reading specialist, we would be losing the guidance counselor. That was all uncontested. Nobody contradicted that at all. And it's not because of the cost per student, but the cost per student is weighed against the taxes, your real estate taxes primarily. In fact, the testimony was that the cost per student really is a nonissue here because these students are spread across several grades. So you take one student out of a class, the cost of operating that class doesn't change. We still have the teacher, we still have the building, we still have all of the busing costs. We have everything that's there. Taking that one student out doesn't save us anything. But the house that the student lived in goes off of your tax rates. That's right. We lose that assessed value and we lose those tax dollars. And as said in the Carver case, whether a detaching district will remain financially healthy is more important than the size of the loss of tax revenues and the assessed valuation. You have to look at the district and its actual budget, which was uncontradicted here. But, in fact, if we had a district with huge surpluses, maybe $400,000 doesn't mean much. But in a district our size, where we're already pared down to where we are, this $400,000 is huge. And, yes, there was that controversy. Are we losing $442,000 or $470,000? That makes no difference. When we're hitting numbers that are in six figures like that, where we may be looking at cutting up to 10 staff and these programs that affect those kids remaining in that school, it's a huge deficit for us. Should we look at, or should anyone look at, the percentage of that $400,000 to the total budget, or do we just look at the $400,000 and what it means? I think you can look at the percentage, but I think that's less meaningful. And I think that's what the reference was in Carver. It's, are you financially healthy? Considering where you are today and where we all know all school districts are today, where the state's been holding back on state aid, where we know EAVs are going down, if you look at that, the number today is the critical number, the actual dollar number. How does that impact the district and its budget, as opposed to whether it's a given percentage? And in this case, it is a very significant percentage. This assessed valuation ranged between 5.87% and 6% of our total assessed valuation. It was our tax revenue. It's a large number all by itself, percentage-wise. But I don't think that's the key. I guess my time is up. Do you have anything else you wanted to say with that regard? And then I'll ask my colleagues if they have questions. No, actually, I was going to go to a different issue at that point. Thank you. And you know we are asking that the regional board be reversed and the circuit court affirmed. Thank you. Thank you. I had some confusion with the numbers, but I suspected that's what you were asking for. Just a few points. To respond to District 88, it is not an overview of what the board did in terms of denying the motion to dismiss because of the signatures. That is a question totally addressed to the board as a fact-finding function of its position, and thus there's deference given there. But they didn't take any evidence, and they discouraged it, actually. One of the board members said, you know, we don't need that. We can do this. They were faced with very vigorous arguments by Districts 48 and 88 not to take evidence, that you simply need to make this determination by reading what the statute says, which is look to see if the signatures match, which is what they did. They did what the districts asked them to do. So since they did what the districts asked them to do and didn't take in any other evidence and only looked at the documents, how did we do anything, have anything other than a de novo review? It's fact-finding. They looked at the evidence that they had. They looked at the signatures, and they made their own subjective analysis of it and determined that there were a sufficient number of signatures. Just like you could have two different handwriting experts look at the same signature and come to opposite conclusions. Exactly. So that's what they did. But a handwriting expert would be testifying, and the court would make a determination, a credibility determination, as to the testimony of the handwriting expert, would they not? They do, and there were no handwriting experts operating. District 88 and 48 objected to that whole process. So the board did what they asked them to do. Well, regardless of what the board did, what they asked them to do, Counsel, that doesn't have anything to do with our standard of review, does it? I mean, if the board asks you to do, or any attorneys in a case ask the court to do something by way of fact-finding or by way of reviewing evidence, they don't dictate what the standard of review is at the appellate court, do they? They do not. But what the board did is what dictates it, and what the board did was make its own fact-finding analysis of these signatures. There's not a question of law here. If a court is reviewing, the attorneys come in on a case and they say, we don't have any evidence, we're going to ask you to review a videotape. A videotape. And then the court rules, it comes up to the appellate court, and we review the videotape. What is our standard of review at that point? When it's a question of fact, it's a deferential standard. And this was a question of fact. I would suggest to you that if somebody came into a court and said, we don't have any evidence, we have a videotape, that the court wouldn't look at it. You need sworn testimony in order to make a decision. Well, the officer swore to get the videotape in. And then it comes up to us, we're looking at the exact same thing that the trier of fact looked at. But the lawyer said, go ahead and take a look at it. So are they determining what the standard of review is, or is the law determining it? The law determines it. The law determines it. And the law here is, when it's a question of fact, it's a deferential review. As for the comments about Willowbrook not making its adequate yearly progress because of students who are of lesser economic means who didn't do as well, Dr. Krause himself said the students at Willowbrook, the three students at Willowbrook, who didn't make, who didn't do well on the tests, wasn't because of their economic status. And that was at C-1767. John Carroll from District 48 said, I'm sorry, it was John Carroll in District 48 who said, we have three poor, needy kids who didn't do well on the math tests, and that's why our results were bad. And that's at C-1644. As to the financials from District 48, the information they provided to the Regional Office of Education in order for that body to prepare its impact report here was that there was a zero, so they would be in a negative state if this petition were granted. They would be in a deficit. It would be caused by this. And they had a string of zeros on their numbers for their beginning fund balance. Now, that is a major problem. It does skew the results, the financial results. And District 48 doesn't want to make too much hay about that. They don't want you to make too much hay about that. But if those numbers are adjusted for what was or would have been the beginning fund balance, as Mr. Scott did for the board, their balance at the end would have been close to $2 million, $1.9 million. Now, the wound that District 48 is going to suffer here is self-inflicted. And I say that because in 2010, before this hearing, District 48 retired $2 million in debt principal. They made the discretionary decision what to do with their money. But now facing this detachment, that was not such a good decision. Well, again, they made the decision. They didn't do it. I mean, we look at a lot of decisions like this in divorce cases where you changed your circumstance because you were getting a divorce. There is nothing in this record that indicates that Salt Creek did this because they knew a detachment was coming. No, no, no, and I'm not suggesting they did it because of the detachment proceedings. Maybe it was good fiscal policy on their point to reduce the debt. But now, as all school districts are, they're in financial difficulty. And to suggest that the financial difficulty is simply because of this detachment proceedings is not accurate either. We ask that the court affirm the board. Thank you very much. Thank you. All right, counsel, thank you for your arguments. We will take the matter under advisement, make a decision in due course, and we will stand in recess to prepare for another hearing.